ALTO LITIGATION, PC
  Bahram Seyedin-Noor (Bar No. 203244)
  bahram@altolit.com
  Kevin J. O'Brien (Bar No. 278823)
  kevin@altolit.com
1 Embarcadero Center, Suite 1200
San Francisco, CA  94111
Telephone: (415) 779-2586
Facsimile:  (415) 306-8744

Attorneys for Plaintiff,
Booster Fuels, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOOSTER FUELS, INC., | Case No. **'26CV3498 JLS  GC** |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION BASED ON:** |
| v. | |
| SHWETA MADASU, | **(1) MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 ET SEQ.)** |
| Defendant. | **(2) MISAPPROPRIATION OF TRADE SECRETS (CAL. CIV. CODE § 3426 ET SEQ.)** |
| | **(3) BREACH OF CONTRACT** |

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION

Plaintiff Booster Fuels, Inc. ("**Booster**") alleges as follows against Defendant Shweta Madasu ("**Madasu**") for the causes of action set forth below:

NATURE OF THE ACTION AND OVERVIEW

1. Booster pioneered a new model for commercial fueling. Founded in 2015, Booster delivers, on demand, diesel and gasoline directly to fleet vehicles where they are parked. The linchpin of the business is Booster's proprietary operating system, a product of more than a decade of research and millions of dollars of investment. Unfortunately, a trusted senior employee has betrayed Booster. Shweta Madasu, Booster's former Vice President of Product and Technology, misappropriated dozens of key documents reflecting trade secrets on her way out of the company. To make matters worse, she did so to help her new employer—a Booster partner on a key contract—usurp a key business opportunity from Booster.

2. Madasu joined Booster in March 2022 as the Head of Product. Booster eventually elevated her to the Vice President of Product and Technology, the highest technology role in the company. This gave her a seat on Booster's senior leadership team and broad access to Booster's most sensitive information, which her employment contract bound her to protect and return upon her departure. As a sign of the trust placed in Madasu, Booster made her central to a huge business opportunity: winning a contract to fuel a delivery fleet owned by a multinational technology company (hereinafter "**Company A**"), an opportunity worth tens of millions of dollars.

3. This opportunity surfaced in November 2025 when "Company A" issued a request for proposal ("**RFP**"). Booster agreed to pursue the RFP in a joint bid with its business partner, Mansfield Energy Corp. ("**Mansfield**"). Madasu helped run the "Company A" effort for Booster, shaping the technology, pricing, and business strategy.

4. Then Madasu changed sides. In December 2025, just as Booster and Mansfield were finalizing their joint "Company A" proposal, Madasu announced her plan to resign from Booster. She would become Mansfield's Chief Technology Officer. Her last day with Booster would be January 9, 2026. On the way out, she assured Booster that she remained committed to the joint "Company A" bid.

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

5. The red flags emerged shortly after Madasu joined Mansfield. In March 2026, "Company A" reps told Booster—unprompted—that Mansfield's approach had shifted once Madasu became its CTO. Mansfield began advocating for cutting Booster out of the joint bid. This included sharing new "Mansfield Roadmaps" that mirrored Booster's capabilities, without reference to Booster's operating system. These worrisome signs led Booster to review Madasu's activities on its IT systems. The results were alarming: Madasu had gone on a downloading spree of Booster's most confidential files in the weeks leading to her departure. In her final nine days alone, she downloaded more than sixty discrete documents.

6. Madasu saved the largest haul for her last day. To ensure she would have adequate time to steal what she wanted to steal, Madasu asked Booster to delay the expiry of her IT account access to 11:00 PM. This was supposedly so she could "delete [her] personal docs (green card copy, bank statements) etc. from [her] personal G-drive." After Booster granted this request, Madasu deleted no personal files. Instead, she ran at least nineteen separate downloads over nearly eight hours. By the time her access expired, Madasu had scored a cross-section of Booster's entire business model.

7. Against this backdrop, Booster asks the Court to grant preliminary injunctive relief protecting its confidential and trade-secret information. Booster will then seek final resolution of the dispute in arbitration, as called for in its agreement with Madasu.

PARTIES

8. **Plaintiff Booster Fuels, Inc.** is a Delaware corporation with its principal place of business in Tustin, California. Booster operates a mobile-fueling and energy-services business with operations, customers, and partners in California and other states.

9. **Defendant Shweta Madasu** is a natural person who, on information and belief, is domiciled in and a resident of San Diego, California.

JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Booster's first cause of action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §

3

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

1836 et seq. The trade secrets at issue in this case relate to products and services used in interstate commerce, including the mobile-fueling services Booster provides to customers in multiple states.

11.     The Court has supplemental jurisdiction over Booster's state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

12.     This Court has personal jurisdiction over Madasu because she is domiciled in and a resident of California, within this District, and because the acts and omissions giving rise to this action were committed in, directed from, or directed at California.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Madasu resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Booster's claims occurred in this District.

14.     The resolution of disputes between Madasu and Booster is generally governed by a binding arbitration agreement. However, the arbitration agreement excludes from arbitration requests for emergency injunctive relief. This provision confirms the parties' intent to permit judicial requests for provisional relief in aid of arbitration, as authorized under the Federal Arbitration Act and F.R.C.P. 65. By filing this action, Booster does not waive, and expressly reserves, its right to arbitrate all arbitrable claims, and reserves all claims for damages and other relief for determination in arbitration.

## FACTUAL ALLEGATIONS

### A.     Booster's Business Model and Technology

15.     Founded in 2015, Booster set out to reinvent commercial fueling by creating a novel fuel delivery system that supplies fuel directly to commercial fleets and other vehicles where they are parked. To turn this business idea into reality, Booster designed its own proprietary integrated technology platform called the Booster Operating System or "**BoosterOS**." Costing many tens of millions of dollars and taking over a decade to develop, BoosterOS has become the trusted end-to-end solution supporting the most complex fuel delivery needs. With BoosterOS, the company has earned hundreds of millions of dollars in business from Fortune 100 companies, including the largest delivery, school-bus, logistics, and business service fleets in the world. This technology reduces reliance on gas stations, which saves time, eliminates fraud, and keeps

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

communities safer and healthier.  Some enterprise relationships have grown over many years, including with "Company A," for whom Booster has developed various customized extensions of BoosterOS.

B.    Booster Hires Madasu and Makes Her a Senior Company Leader

16.    Madasu joined Booster in March 2022 as the Head of Product.  Booster later elevated her to the Vice President of Product and Technology, the highest technology role in the company.  She signed Booster's "At-Will Employment, Proprietary Information, Invention Assignment, and Arbitration Agreement" ("**Employment Agreement**").  (Ex. A).  The Employment Agreement bound Madasu to protect Booster's "Confidential Information," prohibiting her from misusing the proprietary information of others, and required her to return all Booster property when her employment ended:

> 2(a) **Definition**: "Confidential Information" means any Booster proprietary or confidential information, technical data, trade secrets, or know-how, including but not limited to research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, marketing, or finances, disclosed to Employee by the Booster, whether in writing, orally, electronically, or by observation.
>
> 2(b) **Obligations:** Employee agrees to hold all Confidential Information in strict confidence and not to use it or disclose it to any third party except as required in the course of their employment.  These obligations will continue both during and after the termination of employment.
>
> 2(c) **Third-Party Information**: Employee will not improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity, and Employee will not bring onto Booster premises or use any such information.
>
> 4.  **Return of Booster Property:** Upon termination of employment, Employee agrees to promptly return all Booster property, including but not limited to equipment, documents, data records, and any materials containing or reflecting Confidential Information.

17.    Madasu separately signed the "Booster Fuels Code of Conduct Agreement" on the same day.  (Ex. B.)  Among other terms, Madasu agreed to "Protect Booster Fuels' confidential and proprietary information, including customer data, operational processes, and financial information."  Ex. B at § 3.5.

18.     When Madasu became Booster's Vice President of Product and Technology, it made her a senior member of Booster's leadership team. In this role, she received broad access to Booster's most sensitive and confidential business and technical information.  This included Booster's current and future product development plans, strategic growth initiatives, pricing and packaging, customer and marketing strategy.  It also included the confidential business information of third-parties who work with Booster, among other critical business information.

C.     Madasu Leads the "Company A" RFP Before Resigning to Join Mansfield

19.     Consistent with her role, Madasu played an important part in advancing Booster's most important partnerships and business opportunities.  Chief among them, Booster made her central to its effort to win a contract to fuel "Company A's" delivery fleet—an opportunity worth tens of millions of dollars to Booster.  Booster pursued the "Company A" business jointly with its partner, Mansfield.  From time to time, "Company A" seeks proposals for mobile fueling of various local fleets across the U.S.  Successful proposals require both advanced technology and superb geographic distribution.  Booster has the former; Mansfield has the latter.  In November 2025, the Booster team (Shweta included) reached out to Mansfield to coordinate on a joint bid, in which Mansfield would submit a proposal "Powered by BoosterOS."  This proposal was submitted by Mansfield, with Booster's written permission to use "Powered by BoosterOS."   In leading Booster's side of the joint bid, Madasu had access to sensitive internal information about the prospective deal and Booster's role in it, as well as confidential information relating to "Company A" itself.  Her responsibilities included educating Mansfield on BoosterOS's capabilities as part of the joint effort.

20.     In December 2025, just as Booster and Mansfield were finalizing the terms of their collaboration on the "Company A" RFP, Madasu told Booster that she would resign to become Mansfield's Chief Technology Officer.  Madasu assured Booster that she remained committed to the joint bid and would continue to support it from her new seat at Mansfield. Booster took her at

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

her word, agreeing to a transition period through January 9, 2026.  But she spent the transition period differently than promised.[1]

D.    The Forensic Investigation Reveals Madasu's Misappropriation of Company Files

21.    Following Madasu's departure, Booster understood that Mansfield would continue to collaborate on the "Company A" RFP.  Booster worked in good faith to that end.  Madasu did not.  Mansfield postponed—and then canceled—key planning sessions with Booster.   Then, in March 2026, Booster learned that Madasu had begun actively working in the background to cut Booster out of the "Company A" RFP.  She pressed "Company A" to let Mansfield provide the full range of services that had been Booster's contribution to the joint bid, including services enabled by new technical roadmaps.  Booster's investigation further indicated that Madasu appeared to leverage Booster's confidential technical and pricing information to offer similar services from Mansfield.  In fact, soon after Madasu joined, Mansfield revised its pricing bid to "look eerily similar" to Booster's, according to one source.

22.    These revelations led Booster to investigate Madasu's activities on its IT systems. The investigation revealed serious misconduct.  From January 1 through January 9, Madasu downloaded over sixty documents from Booster's internal system—pulling files from multiple, separate internal storage locations.  These documents contained ***highly sensitive business information, including Booster's confidential and trade secret information as well as confidential information of third parties***.  Even worse, on January 9, her last day at Booster, Madasu sent a Slack message asking to have IT system access extended to 11.00 PM so that Madasu could "delete [her] personal docs (green card copy, bank statements) etc. from [her] personal G-drive."  This was a lie.  In reality, Madasu ran at least nineteen discrete file downloads to capture a cross-section of Booster's sensitive business intelligence.

---

[1] Booster later learned that Madasu began discussions with Mansfield about joining as CTO began in the summer of 2025.  The conflict of interest was not disclosed to Booster until after Booster agreed to the joint bid proposal with Mansfield.

7
COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

**E.       Madasu Took Booster's Trade Secrets**

23.       The information contained in the documents that Madasu wrongfully acquired constituted Booster's protected trade secrets under both the Defend Trade Secrets Act and the California Uniform Trade Secrets Act ("**CUTSA**").  Below, Booster identifies the files and trade secrets that were taken.  This information derives independent economic value from not being generally known to, or readily ascertainable by, Booster's competitors or others who could profit from its disclosure or use.

24.       Booster takes reasonable measures to maintain the secrecy of this information. Booster requires employees to sign confidentiality agreements—including the Employment Agreement and Code of Conduct that Madasu herself signed.  (Exs. A, B.).  When Booster shares confidential information with third-parties, it does so under confidentiality agreements.  Internally, Booster uses secure and password protected IT systems.  Departing employees must return all Booster property and materials containing Confidential Information.  Accordingly, Booster took reasonable steps to preserve the secrecy of the trade secrets.

25.       The trade secrets embodied in the documents Madasu downloaded reflect a comprehensive cross-section of Booster's most valuable proprietary assets.

26.       For example, Madasu downloaded key internal strategy documents.  This includes an "Operational Rhythm and Data Tracking" proposal aimed at establishing a common, company-wide operating model and rhythm.  It included steps for setting strategy objectives, goals, and recurring audit meetings.  Another strategy document she downloaded is the "SLT Goal Setting Philosophy" that discusses revenue goals and board reporting strategy.  She also downloaded the "2026 – H1&H2" workbook, which includes Booster's 2025-2026 engineering and strategy roadmap.  Its disclosure would provide a competitor with visibility into product plans, staffing, customer integration contracts, and internal delivery timelines.

27.       Madasu also downloaded key financial documents. These include an "Annual Operating Plan" setting forth the company's internal budget-and-execution plan for the fiscal year as well as a document reflecting the company's internal operating model.  Madasu also downloaded customer pricing information; customer contracts; and business partnership

documents.  Madasu also downloaded internal proprietary documentation reflecting the functionality of the BoosterOS platform and the customized platform for "Company A."  These include blueprints of Booster's product strategy, platform architecture, and go-to-market positioning.  She also downloaded the BoosterOS Platform—"Company A" Experience documents reflecting the exact commercial structure of the Booster/Mansfield/"Company A" relationship.  Together and separately, these documents reflect key confidential information that has economic value due to their secrecy.

28.     Madasu now holds Booster's confidential and trade-secret information. Information of this kind derives its value from secrecy, and once it is used or disclosed, that value cannot be restored by any award of money.  Madasu's conduct threatens Booster with immediate and irreparable harm to its trade-secret protection, its competitive advantage, and its customer and partner goodwill.  It also places at risk the "Company A" contract worth tens of millions of dollars. There is no adequate remedy at law. Provisional injunctive relief in aid of arbitration is necessary to preserve the status quo until the arbitrator can decide the merits.

CAUSES OF ACTION

COUNT I

Misappropriation of Trade Secrets

(Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)

29.     Booster incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

30.     Booster owns the trade secrets identified at ¶¶ 23 – 28 of this Complaint.  Each of these trade secrets relates to products or services used in, or intended for use in, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1836(b)(1).

31.     Booster has taken reasonable measures to keep the information secret, as set forth above, and the information derives independent economic value from not being generally known to, or readily ascertainable through proper means by, others who could obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

9

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

32.    Madasu misappropriated Booster's trade secrets within the meaning of 18 U.S.C. § 1839(5) by, among other acts, acquiring them while bound by a duty to maintain their secrecy; retaining them after the termination of her employment, without authorization, on personal devices, in personal email, and via an unauthorized messaging application (WhatsApp); failing to return them upon separation; and threatening to use or disclose them. Booster is informed and believes that Madasu's misappropriation is actual and, at a minimum, threatened and continuing.

33.    Madasu's misappropriation has caused, and unless enjoined will continue to cause, Booster immediate and irreparable harm for which there is no adequate remedy at law.

34.    Under 18 U.S.C. § 1836(b)(3)(A), Booster is entitled to an injunction to prevent any actual or threatened misappropriation of its trade secrets, including provisional injunctive relief from this Court in aid of arbitration. Booster reserves its claims for damages, exemplary damages, and attorneys' fees under 18 U.S.C. § 1836(b)(3)(B)–(D) for determination in arbitration.

COUNT II

Misappropriation of Trade Secrets

(California Uniform Trade Secrets Act, Civ. Code § 3426 et seq.)

35.    Booster incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

36.    Booster owns trade secrets within the meaning of California Civil Code § 3426.1(d), including all of the information described at ¶¶ 23 – 28 of this Complaint.  Each trade secret derives independent economic value from not being generally known to, or readily ascertainable by proper means by, others who could obtain economic value from its disclosure or use, and each is the subject of efforts reasonable under the circumstances to maintain its secrecy.

37.    Madasu misappropriated Booster's trade secrets within the meaning of California Civil Code § 3426.1(b) by wrongfully downloading these trade secrets from Booster's IT System in violation of her employment contracts.

38.    Madasu's misappropriation has caused, and unless enjoined will continue to cause, Booster immediate and irreparable harm for which there is no adequate remedy at law.

10

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION

CASE NO. _____

39.     Under California Civil Code § 3426.2, Booster is entitled to injunctive relief to restrain Madasu's actual or threatened misappropriation, including provisional injunctive relief from this Court in aid of arbitration under the Federal Arbitration Act and Federal Rule of Civil Procedure 65.

COUNT III

Breach of Contract

(Employment Agreements)

40.     Booster incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

41.     The Employment Agreement, executed by Madasu on July 29, 2025, is a valid and enforceable agreement between Booster and Madasu. Booster performed all of its obligations under the Employment Agreement.

42.     Madasu materially breached the Employment Agreement, including by (a) failing to hold Booster's Confidential Information in strict confidence and instead retaining and using it after the termination of her employment, in violation of Section 2; (b) failing, upon termination, to "promptly return all Booster property, including but not limited to equipment, documents, data, records, and any materials containing or reflecting Confidential Information," in violation of Section 4; and (c) failing to hold in confidence and to return the confidential information of Booster's customers and partners that Booster received under duties of confidence and that constitutes Booster's Confidential Information within the meaning of Section 2.

43.     As a direct and proximate result of Madasu's breaches, Booster has suffered and, unless Madasu is enjoined, will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law.

44.     The Employment Agreement expressly carves out from arbitration "[r]equests for emergency injunctive relief under Code of Civil Procedure § 1281.8 (California)," and Booster is accordingly entitled to seek provisional injunctive relief from this Court in aid of arbitration under the Federal Arbitration Act and Federal Rule of Civil Procedure 65 to remedy and restrain Madasu's breaches.

COMPLAINT FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION
CASE NO. _____

45.     Madasu also breached the "Booster Fuels Code of Conduct Agreement." (Ex. B.) Among other terms, Madasu breached her obligation to "Protect Booster Fuels' confidential and proprietary information, including customer data, operational processes, and financial information." Ex. B at § 3.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Booster Fuels, Inc. prays for relief as follows:

46.     For a temporary restraining order and a preliminary injunction in aid of arbitration, enjoining Madasu and those acting in concert with her from accessing, using, disclosing, or further retaining Booster's confidential and trade-secret information, to preserve the status quo pending the parties' arbitration of the merits;

47.     For an order requiring Madasu to identify, return, and destroy, and to certify the return and destruction of, all Booster materials in her possession, custody, or control, in whatever form or location;

48.     For an order requiring Madasu to submit her devices, accounts, and storage to a comprehensive forensic examination by a neutral, Booster-acceptable third-party expert to identify, verify, and remediate her possession of Booster materials; and

49.     For such other and further provisional and injunctive relief as the Court deems just and proper, Booster expressly reserving all claims for damages and other relief for determination in arbitration.

Dated:  June 11, 2026                                ALTO LITIGATION, PC

                                                     By: /s/ Kevin O'Brien
                                                     ALTO LITIGATION
                                                     Bahram Seyedin-Noor
                                                     Kevin J. O'Brien

                                                     Attorneys for Plaintiff,
                                                     Booster Fuels, Inc.

# EXHIBIT A

## AT-WILL EMPLOYMENT, PROPRIETARY INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT

This At-Will Employment, Proprietary Information, Invention Assignment and Arbitration Agreement ("Agreement") is entered into between **Booster Fuels, Inc.,** a Delaware corporation, with its principal place of business at 1425 Broadway Drive, Suite 20-6478, Seattle WA 98122 ("Booster"), and ███████ ("Employee") as a condition of Employee's employment or continued employment with the Booster.

### 1. At-Will Employment

Employee understands and agrees that their employment with the Booster is "at-will." This means that either Employee or the Booster may terminate the employment relationship at any time, with or without cause or prior notice, subject only to applicable law. Nothing in this Agreement or any Booster policy shall be construed to alter the at-will nature of the employment relationship.

### 2. Confidential Information

(a) **Definition**: "Confidential Information" means any Booster proprietary or confidential information, technical data, trade secrets, or know-how, including but not limited to research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, marketing, or finances, disclosed to Employee by the Booster, whether in writing, orally, electronically, or by observation.

(b) **Obligations**: Employee agrees to hold all Confidential Information in strict confidence and not to use it or disclose it to any third party except as required in the course of their employment. These obligations will continue both during and after the termination of employment.

(c) **Third-Party Information**: Employee will not improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity, and Employee will not bring onto Booster premises or use any such information.

### 3. Inventions

(a) **Disclosure**: Employee agrees to promptly disclose in writing to the Booster all inventions, designs, discoveries, ideas, processes, techniques, and improvements (collectively, "Inventions") that Employee makes or reduces to practice, alone or jointly with others, during their employment with the Booster.

(b) **Assignment**: Employee agrees to assign, and hereby assigns, to the Booster all right, title, and interest in and to any and all Inventions that:

Docusign Envelope ID: A2D8D55D-4F6C-4943-9FB6-E642010D8564

- Relate to the Booster's business or demonstrably anticipated research or development;

- Were developed using Booster equipment, supplies, facilities, or trade secrets; or

- Result from work performed by Employee for the Booster.

(c) **Excluded Inventions**: In accordance with California Labor Code Section 2870, this Agreement does not apply to an invention that the Employee develops entirely on their own time without using the Booster's equipment, supplies, facilities, or trade secret information, **except** for those inventions that either (i) relate to the Booster's business or (ii) result from work performed by the Employee for the Booster.

Employee acknowledges receipt of and understands the notification required by California Labor Code Sections 2870–2872, which is attached as **Exhibit A**.

### 4. Return of Booster Property

Upon termination of employment, Employee agrees to promptly return all Booster property, including but not limited to equipment, documents, data, records, and any materials containing or reflecting Confidential Information.

### 5. No Conflicts

Employee represents that the performance of all terms of this Agreement and their duties as an employee do not and will not breach any agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust before joining the Booster.

### 6. Arbitration of Disputes

(a) **Agreement to Arbitrate**.  To the fullest extent permitted by law, Booster and Employee agree that any and all disputes, claims, or controversies arising out of or relating to Employee's employment, the termination of employment, or the interpretation, enforcement, or alleged breach of this Agreement shall be resolved exclusively by final and binding arbitration, rather than in court.

This agreement to arbitrate applies to all claims that could be brought in a court of law, including but not limited to:

- Discrimination, harassment, or retaliation;

- Wrongful termination;

- Wage and hour violations;

- Breach of contract;

- Misappropriation of trade secrets or confidential information;

- Tort claims arising from the employment relationship.

Arbitration shall be conducted under the Employment Arbitration Rules of **JAMS** (or another mutually agreed provider) in the county or jurisdiction where Employee last worked for the Company, and shall be governed by the **Federal Arbitration Act (FAA)**.

(b) **Voluntary and Knowing Agreement.** Employee understands and agrees that this arbitration agreement is being entered into **voluntarily**, after the opportunity to **review and consult legal counsel**, and that it involves a waiver of any right to a jury trial in court for covered claims. By signing this Agreement, Employee knowingly waives the right to a trial by jury.

(c) **Opt-Out Right**. Notwithstanding the above, Employee has the right to opt out of this arbitration agreement by sending written notice to the Booster's HR department at **HR@boosterfuels.com** within **30 calendar days** of signing this Agreement. The opt-out notice must clearly state Employee's name and intent to opt out of the arbitration agreement. IOpting out will not affect any other terms or conditions of employment. If Employee does not opt out within this period, this arbitration agreement will become binding.

(d) **Procedural Safeguards**. To ensure a fair process, the arbitration shall:

- Be conducted by a **neutral arbitrator**;

- Permit adequate **discovery and evidence exchange**;

- Provide for a **written award** with the essential findings and conclusions;

- Permit all **remedies available under applicable law**;

- Require that Booster bear all administrative costs unique to arbitration (unless the employee elects to pay some of them voluntarily or as required under federal law);

- Allow each party to be represented by counsel at their own expense;

- Preserve **all substantive rights** that would be available in a court of law.

- Result in a written decision by the arbitrator.

(e) **Claims Not Covered**. This arbitration clause shall not apply to:

- Claims for workers' compensation or unemployment benefits;

- Claims that cannot be arbitrated as a matter of law;

- Requests for emergency injunctive relief under Code of Civil Procedure § 1281.8 (California).

(f) **State-Specific Notice (Required for California and Oregon)**

- **California Labor Code §§ 2870–2872:** *Employee acknowledges that they have received notice under California Labor Code § 2870 regarding inventions developed entirely on their own time without Company resources, which are not subject to assignment.*
- **Oregon Revised Statutes § 36.620:** *To the extent Employee works in Oregon, this arbitration provision is **only enforceable if Employee signs this agreement separately from the main employment agreement**, or initials it below:*

**Employee Initials (Oregon Only):** _____ Date: _____

Docusign Envelope ID: A2D8D55D-4F6C-4943-9FB6-E612010D8564

## 7. General Provisions

- **Entire Agreement**: This Agreement constitutes the entire agreement between the parties concerning its subject matter and supersedes any prior agreements.

- **Governing Law**: This Agreement shall be governed by and construed in accordance with the laws of the State of California.

- **Severability**: If any provision of this Agreement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

- **Amendments**: This Agreement may only be modified by a written agreement signed by both parties.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the dates below.

**Booster Fuels, Inc.**

By: _Lucy Briggs-Farrell_
— DocuSigned by: —
177D824418DC4EF...

Name: Lucy Briggs-Farrell

Title: Senior HR Director

Date: 7/29/2025

**Employee**

Signature: _[signed]_
— Signed by: —
DF31BEC0028C430...

Name: Madasu, Shweta

Date: 7/29/2025

Docusign Envelope ID: A2D8D55D-4F6C-4943-9FB6-E642010D8564

**Exhibit A**

**Notification of Employee Rights Under California Labor Code § 2870**

Employee acknowledges that this Agreement does not require assignment of any invention that qualifies fully under the provisions of Section 2870 of the California Labor Code.

# EXHIBIT B

Docusign Envelope ID: A2D8D55D-4F6C-4943-9FB6-E642010D8564

# Booster Fuels Code of Conduct Agreement

*For Employees and Contractors*

## 1.    Purpose

This Code of Conduct outlines the principles and expectations that guide ethical behavior and professional standards for all Booster Fuels employees and contractors. It ensures alignment with our mission, values, and legal obligations.

## 2.    Scope

This Code applies to all employees, contractors, and representatives of Booster Fuels, regardless of location, job function, or employment status.

## 3.    Core Principles

### 3.1    Integrity and Ethics

- Act honestly and ethically in all business dealings.
- Avoid conflicts of interest and disclose any potential or actual conflicts immediately.
- Do not offer, accept, or solicit bribes, kickbacks, or improper favors.

### 3.2    Compliance with Laws

- Comply with all applicable federal, state, and local laws and regulations, including those related to:
  - Fuel handling and transportation
  - Environmental protection
  - Health and safety
  - Employment and labor laws
- Always Adhere to Booster Fuels policies and procedures.

### 3.3    Safety First

- Follow all safety protocols and training requirements specific to fuel handling, transportation, and operations.
- Report unsafe conditions, near-misses, or incidents immediately.
- Never operate vehicles or handle fuel under the influence of drugs or alcohol.

### 3.4    Respect and Inclusion

- Treat colleagues, customers, and partners with respect, fairness, and professionalism.
- Maintain a workplace free from harassment, discrimination, bullying, or retaliation.
- Embrace diversity and inclusion in all work environments.

Booster_Code of Conduct_v1_07232025

Docusign Envelope ID: A2D8D55D-4F6C-4943-9FB6-E642010D8564

### 3.5    Confidentiality and Data Security

- Protect Booster Fuels' confidential and proprietary information, including customer data, operational processes, and financial information.
- Do not disclose sensitive information without authorization.
- Follow all cybersecurity protocols and report any suspected data breaches.

### 3.6    Responsible Use of Company Resources

- Use company vehicles, devices, tools, and resources for authorized purposes only.
- Avoid misuse, waste, or unauthorized personal use of Booster Fuels property.

### 3.7    Environmental Responsibility

- Perform duties in an environmentally responsible manner.
- Follow spill prevention and response procedures.
- Support initiatives to reduce emissions and waste where possible.

## 4.    Reporting Violations

Employees and contractors are expected to report any suspected violations of this Code. Reports can be made to:

- A direct supervisor or manager
- The HR department
- The Ethics & Compliance team
- An anonymous reporting hotline (if applicable)

No retaliation will be tolerated for good-faith reporting of concerns.

## 5.    Disciplinary Action

Violations of this Code may result in disciplinary action, up to and including termination of employment or contract. Legal action may be pursued where appropriate.

## 6.    Acknowledgment

By signing below, I acknowledge that I have read, understood, and agree to comply with the Booster Fuels Code of Conduct. I understand that violations may result in disciplinary action.

**Name:** Madasu, Shweta _____

**Position:** SM _____

**Signature:** _____

**Date:** 7/29/2025 _____

Booster_Code of Conduct_v1_07232025